**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CESS FRAZIER,<br><br>Defendant. | ) | Criminal Action<br>No. 25-cr-10202-PBS |

**MEMORANDUM AND ORDER**

September 18, 2026

Saris, J.

**INTRODUCTION**

Defendant Cess Frazier ("Defendant") is charged with one count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Defendant moves to suppress statements and evidence obtained during the execution of federal warrants to search his person and home. Defendant argues that his Fourth and Fifth Amendment rights were violated when law enforcement exceeded their authority under the search warrants and compelled him to confess ownership of the electronic devices and to provide the passcode to those devices. Further, Defendant claims that law enforcement obtained his passcode and his confessed ownership of the electronic devices in violation of Miranda v. Arizona, 384 U.S. 436, 479 (1966).

Defendant seeks suppression of his incriminating statements and the evidence subsequently found on his electronic devices. The government denies any constitutional violations and asserts, in the alternative, that the contents of Defendant's electronic devices would have been inevitably discovered.

Following two evidentiary hearings, the Court **ALLOWS** Defendant's motion to suppress (Dkt. 65) with respect to his statements confessing ownership of the electronic devices and the passcode to those devices but otherwise **DENIES** the motion as to the evidence found on his electronic devices under the inevitable discovery doctrine.

## BACKGROUND

### I. The Warrants

On April 28, 2025, the Magistrate Judge issued two search warrants authorizing the search of Defendant's residence and person, including his electronic devices. The search warrant affidavit of FBI Special Agent Bryce Montoya ("Agent Montoya") detailed an undercover investigation by law enforcement officers who specialized in investigating violent crimes against children. Investigators identified sellers of child sexual abuse material ("CSAM") operating on websites and encrypted chatting applications like Telegram. When agents purchased CSAM through the sellers, they were prompted to complete payment through applications such as CashApp, PayPal, and Stripe. Sellers then sent a hyperlink to

a MEGA[1] folder containing images and videos of CSAM. Through the investigation, law enforcement agents obtained lists of individuals who made payments to accounts identified as belonging to CSAM sellers. Law enforcement identified Defendant through these lists.

The warrants authorized law enforcement to use an individual's iris, fingerprint, or face to attempt to unlock devices that use biometric features in lieu of a password or passcode but did "not authorize law enforcement to compel that all individuals present at the [residence] state or otherwise provide the password or any other means that may be used to unlock or access the devices." Dkt. 65-1 Ex. C ¶ 65(h).

## II. <u>Warrant Execution and Arrest</u>

In the early hours of April 29, 2025, nine armed law enforcement officers wearing bulletproof vests arrived at Defendant's residence to execute the search warrants.[2] Upon arriving, the officers drew their weapons and pounded on the apartment door to announce their presence. Two of the nine officers pointed their rifles at Defendant and his mother as they were ordered out of the apartment and into the hallway. When Defendant

[1] MEGA is a cloud-based digital storage and file-hosting website.

[2] Nine officers were involved in the knock-and-announce procedure, approximately six of whom conducted the safety sweep. Around six other individuals were later present on the scene to assist with photographs, recordkeeping, and computer forensics.

exited the apartment, he was wearing only underwear with no shirt or shoes. Five or six agents entered the apartment with guns drawn to conduct a safety sweep of the premises. During this sweep, Agent Montoya stood outside the apartment with Defendant and his mother with his gun drawn. Other officers also stood around Defendant with their guns holstered. Agent Montoya spoke to Defendant and his mother just outside the apartment, telling them that "it's okay" and "you're fine." Dkt. 73-3 ¶ 7.

At the conclusion of the safety sweep, all of the officers holstered their weapons and turned off their body cameras. Agent Montoya and Boston Police Department Task Force Officer Jahad Hasan ("TFO Hasan") then escorted Defendant back into his bedroom so that he could get dressed. At this point, Defendant was informed he was not under arrest.

What happened next was not recorded. Agent Montoya began handing clothes to Defendant as TFO Hasan asked Defendant whether the bedroom they were in was his, to which Defendant replied yes. TFO Hasan then asked Defendant whether the devices on the desk were his. Again, Defendant said yes. According to Defendant, TFO Hasan next told Defendant he "needed the passcode to the phone." Dkt. 65-1, Ex. G ¶ 9. Agent Montoya maintains that TFO Hasan "asked" Defendant what the passcode was. Dkt. 73-1, Ex. 3 ¶ 12. Either way, Defendant told the officers the passcode. TFO Hasan

verbally confirmed with Defendant that the passcode was the same for all his electronic devices.

After Defendant was dressed, Agent Montoya and TFO Hasan brought him down to an unmarked cruiser to simultaneously ask him questions and allow the other law enforcement agents to execute the search warrant. Defendant was not handcuffed or physically restrained at this point. In the cruiser, Agent Montoya and TFO Hasan read Defendant his Miranda warnings and attempted to interview him. Upon being read his Miranda rights, Defendant said he did not want to speak with the officers, and the officers terminated the interview. Unbeknownst to the law enforcement officers at the time, Defendant had a long history of mental health issues, including a diagnosis of schizoaffective disorder, bipolar type. He had been hospitalized numerous times for psychotic episodes including auditory hallucinations, most recently in June 2025. At the time Defendant's motion to suppress was filed in February 2026, he was medicated and saw a doctor on a weekly basis.

After Defendant invoked his Miranda rights, Agent Montoya returned to the apartment to assist the search team. Meanwhile, Task Force Officer Yu Kajita ("TFO Kajita"), who was assigned to the New England Regional Computer Forensics Laboratory ("RCFL") and had arrived on the scene around 6:24 a.m. to assist with the execution of the search warrant, was given the passcode to Defendant's devices. TFO Kajita used the passcode to unlock and

access the contents of five electronic devices found in the apartment, including Defendant's iPhone 14 Pro.

TFO Kajita and Agent Montoya's cursory review of the contents on the iPhone 14 Pro revealed that the Apple ID for the phone was listed as frazier.cess@gmail.com and that the applications Telegram, CashApp, and MEGA were installed. TFO Kajita and Agent Montoya opened Telegram and observed approximately 100 videos of CSAM saved within various chats, including two videos depicting the sexual abuse of an eight-to-ten-year-old child and one video depicting the sexual abuse of a three-to-five-year-old child. CashApp contained user information registered to Cess Frazier. No account for MEGA was logged in, so the agents were unable to observe any information on that application. However, the user profile information on Telegram matched the username previously identified by FBI agents as the username for the MEGA account associated with Defendant's known email account.

While the officers searched Defendant's devices, Defendant remained with TFO Hasan down on the street and was taken nearby to get a coffee. Agent Montoya and TFO Hasan brought Defendant back to the apartment and then arrested him for receipt and possession of child pornography. His electronic devices were seized and taken into evidence.

## III. Magnet GrayKey Technology

Magnet GrayKey ("GrayKey") is a forensic tool used by law enforcement. The physical GrayKey device connects directly to an electronic device such as a phone, allowing agents to bypass the locking feature on the device and extract data without entering a passcode.

Importantly, a phone may be in either "before first unlock" ("BFU") or "after first unlock" ("AFU") status. A phone is in BFU status when it has not been unlocked by the user since the phone was last restarted, whereas a phone in AFU status has been unlocked by a user with a known passcode since the last time the phone was restarted. The phone's status determines how much data GrayKey can extract. GrayKey can extract only very limited data from a phone in BFU status. By contrast, if a phone is in AFU status, anything stored on that device, including CSAM content, could be extracted by GrayKey and subsequently processed by other forensics tools. Defendant's phone was in AFU status at the time it was seized by the officers.

So long as GrayKey possesses the software necessary to extract data on a given device, a phone's third-party applications, SMS/text messages, images, videos, emails, health data, and location data can be extracted from a device in AFU status. Further, if a device is in AFU status, even some third-party applications that have separate and additional security, such as

fingerprint or passcode requirements, can be decrypted such that GrayKey can recover the data in those applications.

TFO Kajita noted that the iPhone 14 Pro he received while on the premises was "powered on and locked by a six-digit pin," supporting his account that the iPhone was in AFU status. Dkt. 94 ¶ 6. By entering the passcode that Defendant had told to Agent Montoya and TFO Hasan, TFO Kajita was able to unlock the phone and subsequently observed the CSAM videos.

If Defendant had not provided the passcode to his devices, TFO Kajita would have brought the iPhone 14 Pro back to the forensics lab where it would have been connected to GrayKey. By April 2025, GrayKey had released software applicable to the iPhone 14 Pro. Because Defendant's iPhone 14 Pro was in AFU status and GrayKey had the necessary software to bypass an iPhone 14 Pro lock screen, TFO Kajita would have been able to extract data from the phone. This extractable data would have included data from Telegram, as the Telegram application on Defendant's phone did not have its own passcode or biometric lock system. If GrayKey were used to extract data, the process would have taken approximately two to eight hours. Therefore, even if Defendant had not provided his passcode, TFO Kajita affirmed that GrayKey would have been able to extract data from his phone, including from Telegram.

## DISCUSSION

Defendant argues that the officers violated his Fifth Amendment, Miranda, and Fourth Amendment rights when they sought his passcode and information about his ownership of certain electronic devices from him during execution of the search warrants. The Court begins with these arguments and, finding a violation of Miranda, then addresses the application of the inevitable discovery doctrine.

### I. Miranda Violation

#### A. Legal Standard

Under Miranda, "law enforcement officers [must] employ procedural safeguards to ensure that a suspect's Fifth Amendment privilege against self-incrimination is respected." United States v. Jackson, 544 F.3d 351, 356 (1st Cir. 2008). As part of these procedural safeguards, officers "must give a suspect proper Miranda warnings before he is subjected to custodial interrogation." Id. "Any statements obtained as a result of custodial interrogation in the absence of Miranda warnings must be suppressed." Id. The government does not contest that Defendant was interrogated or that Defendant did not receive Miranda warnings at this time but argues that he was not in custody when Agent Montoya and TFO Hasan questioned him about his device ownership and passcodes in his bedroom.

An individual is in custody if, "in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" United States v. O'Neal, 17 F.4th 236, 240-41 (1st Cir. 2021) (alteration in original) (quoting United States v. Melo, 954 F.3d 334, 339 (1st Cir. 2020)). Relevant factors in determining whether a suspect was in custody "include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" United States v. Howard, 66 F.4th 33, 47 (1st Cir. 2023) (quoting United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005)). "[T]he level of physical control that the agents exercised over the defendant during the search and interrogation" also carries great weight in custody determinations. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007).

**B. Analysis**

Here, Defendant was in custody for purposes of Miranda. Nine armed law enforcement officers in bulletproof vests arrived at Defendant's apartment around six o'clock in the morning. With guns drawn, the officers ordered Defendant and his mother out of the apartment wearing only the clothes they were sleeping in. With no shirt, shoes, or anything more than his underwear, Defendant was

separated from his mother and surrounded by approximately four armed officers while the remaining officers conducted a safety sweep inside his apartment. When he was questioned by Agent Montoya and TFO Hasan in his bedroom, Defendant had not yet put on clothes.

Although Defendant was interrogated in his home, a location that is generally less intimidating than a police station, "a deprivation of freedom can as readily take place in one's home as at a police station." United States v. Goodridge, 945 F. Supp. 359, 365 (D. Mass. 1996). Defendant was not formally handcuffed or physically restrained, but he was totally under the physical control of the officers during the search and interrogation, as evidenced by officers continuously escorting Defendant during the search, the separation of Defendant and his mother, and the initial early-morning, guns-out arrival of nine officers at Defendant's apartment. See Mittel-Carey, 493 F.3d at 40 (finding that Miranda warnings were required when interrogation occurred early in the morning in the presence of many officers even though the interrogation took place in the defendant's home); Sprosty v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the defendant] was being held is the degree to which the police dominated the scene.").

While Defendant was told he was not under arrest, the totality of the circumstances here reflects a police-dominated environment from which a reasonable person would not believe they were free to

leave. No reasonable person awakened at six o'clock in the morning by several armed law enforcement officers, ordered out of their apartment in merely their underwear, and then escorted by police into their own bedroom to dress would believe they were at liberty to terminate an interrogation and leave.

In sum, the Court finds that Defendant's statements regarding his ownership of, and passcode to, his electronic devices were made during custodial interrogation and in violation of Miranda.

## II. Inevitable Discovery

### A. Legal Standard

It is well established "that evidence that 'would inevitably have been discovered without reference to the police error or misconduct' may be admitted at trial." United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011) (quoting Nix v. Williams, 467 U.S. 431, 448 (1984)). "Such evidence is admissible 'so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully'" constitutional protections. Id. (quoting United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994)). The government bears the burden of proving the application of the inevitable discovery doctrine by a preponderance of the evidence. See United States v. Delgado-Pérez, 867 F.3d 244, 258 (1st Cir. 2017).

**B. Analysis**

The government contends that suppression of the contents of Defendant's devices, including the CSAM images and videos, is not warranted despite any potential constitutional violation because that evidence would have inevitably been discovered.[3] The Court concludes that the government has met its burden of proving the applicability of the inevitable discovery doctrine and, thus, declines to suppress the contents of the devices.[4]

First, the government had lawful, independent means of discovering the evidence on Defendant's devices and would have used those means to gather the evidence if Defendant had not provided the passcode to his devices. The search warrants authorized "the seizure of electronic storage media" and foresaw that "forensic tools" would then be "able to extract data from [the] devices" seized. Dkt. 65-1, Ex. C ¶¶ 59, 65(i). Had Defendant not provided his passcode to the devices, the devices would have been seized pursuant to the valid warrants and brought to the RCFL,

[3] The government does not argue that any exception to the exclusionary rule applies to the statements Defendant made regarding his passcode and ownership of certain electronic devices.

[4] Given its rulings on the other issues raised by Defendant's motion, the Court need not address his arguments that his statements disclosing his passcode and confessing ownership of the electronic devices were compelled in violation of the Fifth Amendment or that the law enforcement officers exceeded the scope of the search warrants in violation of the Fourth Amendment.

where the forensic tool GrayKey would have been used to extract data from Defendant's devices.

Second, the relevant evidence found on Defendant's devices would have inevitably been discovered had the government obtained the data through GrayKey rather than through inputting Defendant's passcode. By April 2025, GrayKey had software compatible with Defendant's devices, which were in AFU status at the time of seizure. Thus, due to the AFU status and type of Defendant's devices, the RCFL had the necessary software to extract data from Defendant's devices. The Telegram application on Defendant's phone did not have a separate passcode or biometric lock system, so GrayKey would have been able to extract data from that application. Officers on the scene during the search warrant located around 100 videos of CSAM on Defendant's Telegram application within his saved communications. This data would have been extractable by GrayKey, and extraction could have been accomplished within hours of Defendant's device being connected to GrayKey.

Third, the application of the inevitable discovery doctrine here would not "provide an incentive for police misconduct or significantly weaken constitutional protections." United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006). This inquiry is case- and fact-specific and "requires an appreciation of the societal costs of the exclusionary rule." Id. at 29.

Here, the government has proven "not only that [it] could have" obtained the evidence on Defendant's devices without Defendant providing his passcode, "but also that [it] would have" inevitably discovered the evidence through lawful means. Id. On these facts, the officers "had little incentive to try to obtain" the passcode or evidence through unlawful means. Id.; see United States v. Scott, 270 F.3d 30, 45 (1st Cir. 2001) (concluding that the third prong of the inevitable discovery exception was met where applying the exception "would not . . . act . . . as an incentive to unconstitutional behavior").

Defendant points to two cases in which courts were unwilling to apply the inevitable discovery doctrine where both the Fourth and Fifth Amendments were violated, but neither case is instructive here. In United States v. Rullo, police used excessive force to restrain a defendant who had fled on foot by forcing the defendant face-down onto a porch, punching and kicking him, calling him names, and telling him, "Give us the gun and we'll let you up." 748 F. Supp. 36, 39-40 (D. Mass. 1990). The court also believed that at least one of the agents on the scene later testified improperly, either fabricating answers or knowingly testifying falsely. See id. at 45. Similarly, in United States v. Gonzalez, the defendant had been punched and beaten by the arresting officers and was dazed and bleeding at the time he was read his Miranda warnings. 719 F. Supp. 2d 167, 169-70 (D. Mass. 2010). The

egregious physical force coupled with officers testifying deceitfully about their conduct led the courts in both Rullo and Gonzalez to refuse to apply the inevitable discovery doctrine. See Rullo, 748 F. Supp. at 44-45; Gonzalez, 719 F. Supp. 2d at 185-87.

These same factors distinguish the present case. The Court agrees that an overwhelming number of police officers arrived at Defendant's apartment to execute the search warrant. This created a police-dominated environment in which Defendant was made to stand outside his apartment in his underwear and subsequently dress in the presence of two agents. However, Defendant himself was not subject to excessive physical force, and there is no evidence that officers have attempted to conceal information or deceive the Court. By the time of Defendant's questioning, officers had already located the electronic devices subject to the search warrant and had an independent means of obtaining the evidence on Defendant's phone.

Accordingly, the Court is persuaded that the inevitable discovery doctrine applies and that this finding will not incentivize constitutional violations by police when executing search warrants of this nature in the future.

## ORDER

For the foregoing reasons, the Court **ALLOWS** the motion to suppress (Dkt. 65) as to Defendant's verbal statements regarding

ownership of the electronic devices and the passcode to those devices but **DENIES** the motion as to the evidence obtained on the devices under the inevitable discovery doctrine.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge